GARRARD SALES CORP. *v.* UNITED STATES (No. 4538)[1]

[1] C. A. D. 369.

United States Court of Customs and Patent Appeals, June 17, 1947

*Jordan & Klingaman* (*Edward F. Jordan* and *J. L. Klingaman* of counsel) for appellant.

*Paul P. Rao*, Assistant Attorney General (*Richard E. FitzGibbon* and *Alfred A. Taylor, Jr.*, special attorneys, of counsel), for the United States.

[Oral argument April 1, 1947, by Mr. Edward F. Jordan and Mr. FitzGibbon]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, JACKSON, and O'CONNELL, Associate Judges

O'CONNELL, Judge, delivered the opinion of the court:

This is an appeal from a judgment of the United States Customs Court, First Division, C. D. 950, sustaining the action of the Collector of Customs at the port of New York who classified an importation of merchandise from England consisting of automatic record changer units as parts of phonographs and assessed thereon a duty of 30 per centum ad valorem under paragraph 1542 of the Tariff Act of 1930, and overruling appellee's protest claiming that the merchandise was properly dutiable at 25 per centum ad valorem as articles having as an essential feature thereof an electrical element or device, such as electric motors, under paragraph 353 of the same act as modified by the trade agreement with the United Kingdom, T. D. 49753.

The statutory provisions of the Tariff Act of 1930 here involved, so far as pertinent, read as follows:

PAR. 1542. Phonographs, gramophones, graphophones, dictophones, and similar articles, and parts thereof, not specially provided for, 30 per centum ad valorem * * *.

PAR. 353. All articles suitable for producing, rectifying, modifying, controlling, or distributing electrical energy;

electrical telegraph (including printing and typewriting), telephone, signaling, radio, welding, ignition, wiring, therapeutic, and X-ray apparatus, instruments (other than laboratory), and devices; and

articles having as an essential feature an electrical element or device, such as electric motors, * * *

all the foregoing, and parts thereof, finished or unfinished, wholly or in chief value of metal, and not specially provided for, 35 per centum ad valorem.

Paragraph 353 as modified by the trade agreement with the United Kingdom, *supra,* so far as pertinent, reads:

Electrical signaling, radio, welding, and ignition apparatus, instruments (other than laboratory), and devices, * * * and all other articles suitable for producing, rectifying, modifying, controlling, or distributing electrical energy, and articles having as an essential feature an electrical element or device, such as electric motors, * * * all the foregoing, not specially provided for, finished or unfinished, wholly or in chief value of metal * * * 25% ad val.

 *       *       *       *       *       *       *

Parts, not specially provided for, finished or unfinished, wholly or in chief value of metal, of any articles provided for in any item numbered 353 in this schedule, shall be dutiable at the same rate of duty as the articles of which they are parts.

The evidence discloses that each of the imported articles is a unit composed in chief value of metal which can be used either in a phonograph or in a phonograph-radio combination for the purpose of automatically changing a record after it has been played. It is stipulated that each of such articles, as well as the phonograph-radio combination, has "an electric motor as an essential feature and integral part thereof" and that the phonograph-radio combination cannot function as such without the record changer unit.

Counsel for the Government makes the following pertinent statement in its brief:

The article here in question consists of an electric motor to which is attached a turntable suitable for holding phonograph records while being played, a "pick-up head" which, when the turntable revolves, translates the sound track of the phonograph record into electrical impulses of the corresponding audio frequencies, and a mechanism for automatically changing the records after they have been played. None of the units can be used for the purpose for which it was designed unless the output of the pick-up head is set into a suitable audio-frequency amplifier and loudspeaker system, neither of which accompanied any of the units in question upon their importation.

When the unit is installed in a phonograph-radio combination, the radio cannot be operated while the combination is used as a phonograph and vice versa because there is but one amplifying and one loud speaker system in the described combination and those two elements of that system are required to operate either the phonograph or the radio receiving set.

It is stipulated that units such as the Garrard record changers were not imported to the United States prior to 1937, and since that time have been chiefly used in this country in phonograph-radio combinations, the use of such units in phonographs which were not combined with radios being "very minor," and that the same is true of such "similar articles" sold and used in the United States on or prior to June 18, 1930.

The electrically operated phonograph-radio combination, according to the testimony, first came on the market in this country about 1925, and was developed by the radio industry "to promote sales and have

products which would be something that normal competition wouldn't be able to meet, particularly the more expensive units."

It is not disputed that without the record changer unit the phonograph-radio combination would be just a radio set and that the device is no part of a radio. Appellant contends that for tariff purposes the record changer unit here involved likewise is no part of a phonograph but a part of something other than a phonograph, to wit, a phonograph-radio combination, and that the court below made a reversible error in holding that the imported unit is dutiable as a part of a phongraph or as a part of a similar article under paragraph 1542.

The Government takes the position that although the two mechanisms of the combination are combined in one cabinet and use some parts in common, the phonograph and the radio do not supplement or complement each other but on the contrary each retains its respective identity and so does its parts. Therefore the imported unit here involved is part of a phonograph and dutiable as such or as parts of similar articles under paragraph 1542.

The court below held that the involved combination constituted two separate and independent instruments, that the imported unit must be treated as an entirety, such as a part of a phonograph, that the provision for parts of phonographs and similar articles in paragraph 1542 is more specific than the provision in paragraph 353 for "articles having as an essential feature an electrical element or device" and that the imported merchandise was dutiable under paragraph 1542 as parts of phonographs and similar articles, citing *United States* v. *Dryden Rubber Co.*, 22 C. C. P. A. (Customs) 51, T. D. 47050; *Ralph C. Coxhead Corp.* v. *United States*, 22 C. C. P. A. (Customs) 96, T. D. 47080; *Julius Forstmann & Co.* v. *United States*, 28 C. C. P. A. (Customs) 222, C. A. D. 149.

As hereinbefore described, none of the imported articles can be used for the purpose for which it was designed unless the output of the pick-up head is set into a suitable audio-frequency amplifier and a loud speaker system, and it is conceded that the imported record changer is an integral and essential part of a phonograph and radio combination without which the combination could not function as such.

It is clear that a phonograph and a radio are two separate and distinct articles, and this court has held that two articles designed and constructed so as to be used together does not necessarily make either article a part of the other. *United States* v. *Willoughby Camera Stores, Inc.*, 21 C. C P. A. (Customs) 322, T. D. 46851.

It is also clear that the phonograph and the radio when combined in a single unit constitute a separate and distinct article which is something more than either. The addition of the radio to the phono-

graph added an important feature to the phonograph which created a new combination article which is not a phonograph or an article similar thereto within the purview of paragraph 1542. See *Thorens, Inc.* v. *United States*, 31 C. C. P. A. (Customs) 125, C. A. D. 261.

Furthermore, a combination phonograph and radio set, such as that here involved, if imported would be dutiable as an entirety and could not properly be classified either as a phonograph or a radio.

It has been suggested that by the use of the language "and similar articles" contained in paragraph 1542, *supra*, Congress intended to include in that paragraph combination phonograph and radio sets for the reason that a radio and a phonograph are similar in many respects to the articles named.

More particularly, it has been suggested that a combination phonograph and radio, a phonograph, and a radio are all sound-producing articles, that they are all in the same art, are necessarily manufactured and produced in the same places, and therefore the phonograph and radio combinations are "similar articles" to the articles named in paragraph 1542; and that the pertinent legislative history of the provision overwhelmingly supports that conclusion.

A review of the respective tariff enactments regarding the articles enumerated in paragraph 1542, *supra*, discloses that the tariff act of 1909, paragraph 468, provided for "phonographs, gramophones, graphophones, and similar articles, or parts thereof, forty-five per centum ad valorem"; and that paragraph 374 of the tariff act of 1913 was identical with paragraph 468 of the tariff act of 1909, except that the rate of duty was 25 per centum ad valorem.

Paragraph 1444 of the Tariff Act of 1922 also provided for "Phonographs, gramophones, graphophones, and similar articles, and parts thereof, not specially provided for," at 30 per centum ad valorem. That paragraph also provided for "needles for phonographs, gramophones, graphophones, and similar articles, 45 per centum ad valorem."

There is no reference in the Summary of Tariff Information of 1921, page 1189, relative to paragraph 1442 of H. R. 7456, which later became paragraph 1444 of the Tariff Act of 1922, to combination phonograph and radio sets. There the Tariff Commission reported that—

* * * The essential parts of a phonograph are a funnel for receiving the sounds, a diaphragm which vibrates with these sounds and to which is attached a point, and a covered cylinder with which the point makes contact. The Edison diaphragm is iron, the point metallic, and the cylinder covered tin foil. By revolving the cylinder the recorded sound is reproduced. The graphophone applies the phonograph principle of sound record and reproduction, but substitutes a wax cylinder. The term "graphophone," however, is being supplanted by "phonograph." * * *

Under the heading "Suggested changes," the Tariff Commission reported that—

The phrase "and parts thereof" is apparently intended to apply to phonographs, etc., as well as to similar articles. * * *

It will be observed that under the tariff acts of 1909, 1913, and 1922, Congress provided for phonographs, etc., and similar articles and parts thereof. It is clearly evident that by "similar articles" included in those provisions of previous tariff acts, Congress had no intention of including combination radio and phonograph sets, and although Congress in paragraph 1542 of the Tariff Act of 1930 added to the provisions in the previous tariff acts the term "dictophones," it did not specially include therein combination radio and phonograph sets.

It is our view, therefore, that by the language "and similar articles" contained in paragraph 1542, *supra*, Congress did not intend to extend the operation of that paragraph to include combination radio and phonograph sets, although the Tariff Commission, in the Summary of Tariff Information 1929, volume 2, page 2111, stated that "Combination phonograph and radio sets are also being produced."

In other words, Congress was definitely aware at the time paragraph 1542 was enacted in the Tariff Act of 1930 not only that phonographs were being produced but also that combination phonograph and radio sets were also being produced.

Congress did not see fit, however, to include such combinations among the articles specified in that paragraph, although it did amend paragraph 1542 by including dictophones, which record and reproduce sound, within the provisions of the statute so as to conform to a then existing administrative practice in fixing duties thereon. Congressional Record, vol. 72, part 2, 71st Congress, 2d session, January 6, 1930, to January 23, 1930, page 1966.

The Government excuses the omission of the combinations from the statute on the ground that the production of such combinations was in its infancy and that Congress intended to include them within the class of articles similar to those specially provided for in paragraph 1542. Appellant makes the following pertinent statement in its brief regarding the action by Congress:

The inference is rather clear that had it any intention of including the combination instruments it would have done so then and there. The term "similar articles" would in all likelihood have carried dictophones, whereas it is not likely that the combination instruments would have been covered thereby. With this situation before it, Congress, had it intended the combinations to be included, would have named them, for the need to do so was much more apparent than the need for naming dictophones.

Furthermore, as far back as 1925 the Board of General Appraisers (now the United States Customs Court) had occasion to consider and pass upon the application of the provisions for "similar articles" as prescribed in paragraph 1444 of the Tariff Act of 1922, which, with the exception of the provision for dictophones, is identical with the provisions of paragraph 1542, *supra*. See *Brand Co. et al.* v. *United States*, T. D. 40649, 47 Treas. Dec. 113, 115.

In that case it was held that mica disks with a hole drilled in the

center and designed for use exclusively as parts of phonographs were properly dutiable as such parts under the specific provision therefor in paragraph 1444, and that similar unpierced mica disks suited for use as parts for radio instruments were not "similar articles" to the articles named in such paragraph. On the point here in question the decision reads as follows:

While in a general sense all of the instruments referred to might be classed as sound-producing mechanisms, we are not prepared to hold that a radio apparatus is a "similar article" to a phonograph, gramophone, or graphophone, as contemplated by paragraph 1444. The latter instruments both record and reproduce sound, whereas the radio, like the telegraph and telephone, merely transmits sounds in a manner which can scarcely be considered as recording or reproducing them. In the case of the radio the transmission is as direct as one person speaking to another through a speaking tube or through the telephone. There is no recording of sound for the purpose of reproduction. True, there is a marvelous amplification and immediate transmission of sound as in the case of the telephone, but there is no permanent or even temporary record made thereof. We can conceive of an alleged similarity between the radio and the telephone but not between the phonograph and the radio.

It must be presumed that the Congress was fully cognizant of the decision in the *Brand Co. et al.* case, *supra*, at the time of the enactment of paragraph 1542 of the Tariff Act of 1930. In view of the decision in that case, it is unthinkable that Congress would have had in mind including combination phonograph and radio sets in paragraph 1542 as an article similar to phonographs. On the contrary, had the Congress intended to include such an article within that paragraph, it would have said so.

Congress certainly knew that a combination phonograph and radio set was no more a phonograph, or an article similar thereto, than was a radio, or an article similar thereto, and it follows, of course, that if it was not the purpose of Congress to include combination phonograph and radio sets in paragraph 1542, *supra*, parts of such articles could not have been intended to be covered by that paragraph.

It might be that if a complete radio and a complete phonograph were imported in a single cabinet, each would be a separate entity for tariff purposes. However, in the instant case, neither the radio nor the phonograph is complete without the frequency amplifier and the loud speaker which is common to both and which is necessary for the operation of each.

It is to be understood, of course, that the decision in this case is limited to the facts presented by the record.

For the reasons stated, the judgment is *reversed* and the cause *remanded* for proceedings consistent with the views herein expressed.

BLAND, Judge, specially concurring.

I concur in the result.

The majority opinion simply holds that the combined radio-phonograph automatic record changer unit involved is not provided for or

described in paragraph 1542 and that since it is stipulated as being of the character of articles mentioned in the third provision of paragraph 353, being a part of an article having as an essential feature an electrical element, it naturally falls therein without any necessity of considering the competitiveness of the two paragraphs involved.

The majority is mistaken in holding that the instant merchandise is not a part of an article similar to those *eo nomine* provided for in paragraph 1542. The gist of the majority opinion in this respect is that it is more than a phonograph. Of course it is. It is not claimed that it comes in under any of the specifically named articles but that it is described by the provision, "and similar articles, and parts thereof."

A radio and a phonograph are similar in many respects to the articles named. See *United States v. R. W. Cramer & Co.*, 21 C. C. P. A. (Customs) 379, 382, T. D. 46911, citing *United States v. Massin*, 16 Ct. Cust. Appls. 19, T. D. 42714. In the latter case this court quoted the following definition of "similar":

Similar. a. 1. Nearly corresponding; resembling in many respects; somewhat like; bearing a general likeness.

If a combination radio-phonograph does not resemble or is not similar to the articles named in this paragraph, I can conceive of nothing that could have been meant by the expression, "similar articles"—all sound-producing, all in the same art, all necessarily manufactured and produced in the same places. If it were not for paragraph 353, why should not a radio-phonograph combination be classified in paragraph 1542?

My view in this respect is abundantly, and I think overwhelmingly, supported by a consideration of the legislative history of the provision.

When the Tariff Act of 1930 was being considered, the Tariff Commission submitted for the consideration of Congress a Summary of Tariff Information. At page 2111, vol. 2, the Tariff Commission gave Congress information with respect to paragraph 1542, which, with the exception of the term "dictaphones" (added by the Senate Finance Committee), is identical with the Tariff Act of 1922. In fact, the same general provision, "and similar articles," has been in all predecessor paragraphs in all tariff acts for half a century. After quoting the paragraph, the following is stated:

### PHONOGRAPHS, GRAMOPHONES, ETC.

DESCRIPTION AND USES.—Phonographs, gramophones, and graphophones are instruments for recording or reproducing speech, music, and other sounds. The term phonograph has virtually replaced the other names in current usage. *Combination phonograph and radio sets are also being produced.*

PRODUCTION.—The principal producing States are New Jersey, Connecticut, Michigan and Illinois. The large increase in production in 1927 over 1925 was caused in part *by the number of combination phonograph and radio sets that were*

*produced.* Switzerland, Germany, and the United Kingdom are the chief centers of foreign production. Statistics of domestic production of phonographs, *including dictating machines and combination phonograph and radio sets,* follow: * * * [Italics mine.]

Following the table showing the statistics of domestic production, we find the following:

IMPORTS.—Assembled phonographs, gramophones, *and similar articles* were not reported separately in import statistics prior to September 22, 1922. The chief sources of imports for 1927 were Germany, Switzerland, and the United Kingdom. In 1927 imports of phonographs *and similar articles* were negligible as compared with domestic production. The low unit value of imports of phonographs *and similar articles* ($0.563 in 1927) compared with the unit value of domestic production (about $47 in 1927) indicates that the types imported are not comparable with the domestic production. Import Statistics follow: * * * [Italics mine.]

From the foregoing, it would seem clear that Congress was told that paragraph 1542 at that time covered articles and parts of articles like that at bar.

We simply should not ignore such pertinent legislative history, and I have not the slightest doubt that many combination articles which do not contain electrical elements to bring them within paragraph 353 are provided for as "similar articles" in paragraph 1542.

Having concluded that the instant merchandise is described in both competing paragraphs, where should it be classified?

That brings us back to some of the cases where the sole issue presented was one of specificity.

It will be noticed that both provisions contain the phrase, "and not specially provided for," and under our holdings in numerous cases under such circumstances both provisions should be ignored. *United States* v. *Richardson,* 13 Ct. Cust. Appls. 280, T. D. 41214; *United States* v. *Lo Curto & Funk,* 17 C. C. P. A. (Customs) 19, T. D. 43319; *United States* v. *S. S. Perry,* 25 C. C. P. A. (Customs) 282, T. D. 49395.

The pertinent provision of paragraph 353 has been held not to be a designation by use, but if it were a designation by use and therefore, under certain decisions, more specific than an *eo nomine* provision or a provision for "similar articles," it would make no difference. It is my view that in determining what falls within paragraph 353 the question of relative specificity is not a proper consideration.

In *United States* v. *Dryden Rubber Co.,* 22 C. C. P. A. (Customs) 51, T. D. 47050, we stated, with reference to a rubber-cutting machine, the following:

In view of the very evident intent of the Congress to gather, generally, various types of electrical devices into this paragraph, it is believed that this machine, if essentially an electrical machine, may properly be considered as of the class to which the stated language of the paragraph refers.

We also there stated that the case of *Coxhead Corp.* v. *United States,* 22 C. C. P. A. (Customs) 96, T. D. 47080, which was handed down

concurrently therewith, "is in harmony with the views herein expressed."

In the *Coxhead* case, which involved an electrically operated calculating machine, we exhaustively reviewed the legislative history to which the opinion in the *Dryden* case referred and set it out at great length, particularly the reports of the Senate and House committees which reported the bill which became the Tariff Act of 1930, and arrived at the conclusion that in conformity with the intent of Congress we should hold that regardless of how specifically a machine or device was named in another paragraph of the tariff act (unless other considerations not present here prevailed) the said paragraph should be invaded and the articles therein named should be drawn into the electrical paragraph, 353, if the article contained, as an essential feature, an electrical element. As was stated in the *Coxhead* case, Congress stated in effect that paragraph 353 was a new provision to make a uniform rate of duty upon all articles of this character no matter where they were found in the statute unless more commanding language was used in the invaded paragraph than prevails here or in the machine paragraph.

It is noted that in the hollow-ware paragraph, 339, which provides specifically for certain table, household, kitchen and hospital utensils, etc., there is the added provision, "the foregoing rates shall apply to the foregoing articles whether or not containing electrical heating elements as constituent parts thereof." The duties are higher than in paragraph 353. It is probable (I have not made a complete examination) that other paragraphs likewise contain similar provisions to that found in 339.

In the case of *United States* v. *R. W. Cramer & Co.*, 22 C. C. P. A. (Customs) 45, T. D. 47049, we held, *upon legislative history*, that it was not the purpose of Congress in enacting paragraph 353 to rob the clock paragraph of electrical equipment and that therefore the issue of relative specificity was pertinent and important. That is not the situation at bar. There is nothing in the legislative history or in paragraph 1542 itself to indicate that Congress, in the enactment of paragraph 353, did not intend to invade that particular paragraph.

Why should not an electrically operated phonograph or a similar article, under the circumstances above recited, be taken out of the phonograph paragraph, even though *eo nomine* provided for, and brought into the electrical paragraph where a uniform rate of duty upon such electrical devices was provided for?

I wonder what the majority would have done if they had found that the combined instrument at bar was similar to a phonograph. Both provisions contain not specially provided for clauses; one provides for a phonograph and the other for an article. I suppose since the portion of paragraph 353 involved is not a designation by use (and we have so

held) that an electrically operated phonograph or a part of it would be more specifically covered in paragraph 1542 than by the provisions in paragraph 353. Therefore, the court would hold that a phonograph would be held dutiable under 1542 at 30 per centum ad valorem, but if it were an electric washing machine it would be classified under 353 rather than under the machine paragraph 372. If perchance it happened to be an electric machine such as a sewing machine, it probably would be more specifically provided for in paragraph 372 and therefore could not be drawn into the provisions of paragraph 353.

After very much consideration it is my firm belief that every paragraph in the Tariff Act which covers electrical articles such as are provided for in 353 was intended to be invaded unless the legislative history showed to the contrary, or unless the paragraph itself to be invaded provided to the contrary, as was the case in the hollow-ware paragraph 339, and other paragraphs in the statute. How otherwise could the declared purpose of Congress be accomplished?

In the instant case the Government has stipulated that the electrical motors in the radio-phonograph record changer units are essential elements. This eliminated any question as to the essentiality of the motors and, in my judgment, in view of the legislative history and the circumstances hereinbefore referred to, the relative specificity of the two terms was a matter of no concern, because, as above stated and as held in the foregoing cited cases, even though *eo nomine* named elsewhere, if they were electrical they came out and went into paragraph 353.

The fact that this court has been presented issues in this character of cases upon the doctrine of relative specificity alone, depending upon a "use" provision and the fact that the cases were decided upon that issue (which cases are referred to in the briefs) does not change the situation. The doctrine of "use" goes to the question of relative specificity, and specificity is not controlling where the articles fall within paragraph 353.

Discussion by counsel as to which provision is the more specific by reason of a consideration of a "use" provision (which goes to the question of specificity) is purposeless, because it is clearly obvious, and we have so held, that Congress intended to invade more specific provisions and bring the specified articles into paragraph 353.

However, I have no criticism of counsel for discussing the holdings in certain decisions by this court if they thought that such consideration might be important in the decision of this case. (The majority opinion shows that it was important.) But after all, in view of the legislative history cited in the *Coxhead* and *Dryden* cases, it, from my viewpoint, was unnecessary.

Since writing the above, the majority have added much to the opinion concerning the legislative history, and, I think, stress as being

of controlling influence the fact that during the passage of the act under consideration Congress added the word "dictaphones" but did not provide for "combinations." If this reasoning is carried out it means that no longer can any article be classified under the provision "and similar articles" for the reason assigned by the majority that Congress could have put the similar articles into the bill by name at the time the "dictaphones" provision was inserted. It is reasonable to presume then that the majority would hold that if "similar articles" were known at the time the language was used (and we must presume they were) they should not find classification in this paragraph regardless of the effect of paragraph 353, for the reason that Congress, when it had the opportunity, did not specifically name them.

In my judgment, I respectfully submit, this reasoning is unsound and should not be indulged in even though it enables the court to avoid deciding the embarrassing issue as to whether or not the paragraph is invaded by the provisions of paragraph 353 on account of the legislative history hereinbefore referred to.